United States District Court
Southern District of Texas

**ENTERED**

United States District Court 7, 2017
Southern District of Texas
FILED J. Bradley, Clerk

SEP 0 7 2017

, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| EUGENIO GALINDO, M.D. | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| vs. | § | CIVIL NO. M-16-257 |
| | § | |
| | § | |
| SYLVIA MATHEWS BURWELL, | § | |
| SECRETARY OF THE UNITED STATES | § | |
| DEPARTMENT OF HEALTH AND HUMAN | § | |
| SERVICES | § | |
| Defendant | § | |

## REPORT & RECOMMENDATION

Plaintiff filed this action, pursuant to 42 U.S.C. §405(g), for judicial review of the final, adverse decision issued by Defendant. This case was referred to the undersigned. Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment. Both parties responded to each other's respective motions and then filed replies to the responses. The undersigned held a hearing on the motions in August 2017. This case is ripe for disposition.

After careful review of the pleadings, record, and relevant law, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment be **DENIED** for the reasons explained in this Report, Defendant's Cross-Motion for Summary Judgment be **GRANTED** for the reasons explained in this Report, the final decision of the Medical Appeals Council ("MAC") on behalf of Defendant be **AFFIRMED**, and the case be closed.

## I. Background [1]

This case concerns a determination by the MAC, which upheld and affirmed, after de novo review, the assessment that Dr. Galindo was overpaid by the Medicare program approximately $1.9 million dollars, following a post-payment audit of certain claims submitted by Dr. Galindo. (*See* D.E. Nos. 19; 22.) The overpayments concern the administration of injections of erythropoiesis-stimulating agents (ESAs)—more specifically, injections of erythropoietin alpha ("EPO"). As explained by Plaintiff, erythropoietin is a hormone produced by the kidneys that promotes the creation of new red blood cells by the bone marrow. (D.E. No. 19-1 at 5.) Red blood cells contain hemoglobin, which facilitates oxygen exchange at the cellular level. Anemia is a condition whereby the body does not produce enough red blood cells, which impedes cellular oxygen exchange. (*Id.*) Anemia is always caused by an underlying condition, such as iron deficiency, vitamin deficiency, or certain chronic diseases, such as chronic kidney disease. (*Id.*)

In addition, the overpayments concern evaluation and management (E&M) services. As explained by Plaintiff, who cites the administrative record ("AR"), E&M services involve physician encounters with patients for the purpose of treating, assessing, or managing patients' medical conditions. (*Id.*) E&M services are billed to Medicare using Current Procedural Terminology (CPT) codes. (*Id.*) The specific E&M code billed is generally commensurate with the complexity and extent of the service provided. (*Id.*) For example, CPT codes 99211, 99212, 99213, 99214, and

---

[1] For the sake of judicial efficiency, the undersigned has elected to rely on verbatim excerpts from the parties' briefing to cover undisputed background matters, undisputed summaries of the Medicare program framework in the context of this case, and the parties' respective arguments. The undersigned also excerpts Plaintiff's arguments from his motion for summary judgment because he has argued persistently through the appeal process that the ALJ, the MAC, and the Defendant have misconstrued his arguments. The same will done for Defendant's arguments, as appropriate.

99215 are used by physicians to bill E&M services for established patients. (*Id.* at 5–6.) 99211 represents the lower level of service, whereas 99215 represents the more complex service. (*Id.*) CMS has promulgated documentation guidelines and manual instructions for E&M services. (*Id.*) (citing the Medicare Claims Processing Manual [MCPM] Ch. 12 (Pub. 100-04, Rev. 178) and AR 00088-00103). To properly document an E&M service, the physician must generally address two of the three following areas: history, examination, and medical decision-making. (*Id.*) (citing CPT 2006, 1-10 and AR00090). CMS guidelines, in turn, describe what is required to appropriately document each of the foregoing elements. (*Id.*) (citing AR 00088-00103).

Defendant describes the following as undisputed facts, which Plaintiff had not disputed in his response and surreply to Defendants's motion for summary judgment, and the undersigned finds Defendant's summary consistent with the record:

> Between January 1, 2006 and March 31, 2008, Plaintiff, Eugenio Galindo, M.D. ("Dr. Galindo") was paid $4.7 million by the Medicare program for 8,633 claims that involved erythropoietin (EPO) injections. AR 411. Of this total, he was paid $3,923,439.14 for the EPO injections under procedure code CPT J0885.5 AR 411. Each of these 8633 claims could include additional services, or claim lines, billed at the time of the EPO injection. Within these 8633 claims, Dr. Galindo was paid an additional $197,458.07 for 3100 moderate level evaluation & management (E&M) office visits under procedure code CPT 99214. AR 408. Dr. Galindo was paid $120,426 for providing 8264 therapeutic injections under procedure code CPT 90772, a companion code to CPT J0885. AR 408, 371. The Administrative Law Judge (ALJ) calculated that Dr. Galindo "on average billed code J0885 16 times for each day the clinic was open." AR 371.

> Dr. Galindo's billing triggered a post-payment audit by TriCenturion, a Program Safeguard Contractor (PSC), contracted by federal government to conduct medical and fraud review of Medicare providers. 42 U.S.C. § 1395ddd (b)(1). On or about April 16, 2008, TriCenturion commenced its audit of Dr. Galindo by developing a statistical sampling methodology to review a random sample of 30 Medicare claims that included erythropoietin (EPO) injections under code J0885. AR 416-420. The simple statistically random sampling methodology was designed by Don Edwards, Ph.D. *Id.* The universe composition was, "all paid claim lines ... for Eugenio G.

Galindo, MD (867680) with dates of service between 01/01/2006 and 03/31/2008, and paid between 01/01/2006 and 03/31/2008. The universe was further restricted to claims with CPT J0885. AR 418. TriCenturion executed the statistical sampling to generate a random sample of 30 claims on which to perform medical review. *Id.* Upon request, Dr. Galindo provided the medical records related to the 30 claims.

Nurses at Health Integrity, LLC, a Zone Program Integrity Contractor (ZPIC) and TriCenturion's successor, reviewed the medical records. AR 710. The nurses reviewed the 30 claims, which included 132 claim lines and 23 different procedure codes. AR 710. Of the 132 claim lines reviewed, the nurses denied 49 services, reduced 11 services to a lower procedure code, and allowed 72 services. *Id.* Notably, 26 of the 30 claims (87%) were partially or fully denied. AR 1660.

In July of 2009, Health Integrity, LLC, sent a letter to Plaintiff summarizing the results of the post-payment medical review audit. AR 705-708. Based upon the results of the review, Health Integrity extrapolated an estimated overpayment in the amount of $2,750,811. AR 709, 717.

On October 29, 2009, former Medicare Administrative Contractor TrailBlazer Health Enterprises, LLC ("TrailBlazer") notified Plaintiff of the $2,750,811 Medicare overpayment. AR 720-724. The letter stated, "you were overpaid by at least $2,750,811.00 for office visits, lab tests, injections, chemotherapy and administrations, and oncology management based on the lower limit of the one-sided 90 percent confidence interval." *Id.* TrailBlazer advised Dr. Galindo of his rebuttal and appeals rights and attached detailed spreadsheet outlining the findings. *Id.*

Dr. Galindo submitted a request for redetermination of the alleged overpayment to TrailBlazer on December 1, 2009. AR 7. Trailblazer issued a redetermination decision on May 4, 2012. AR 753-797. TrailBlazer's redetermination decision affirmed the extrapolated overpayment assessment of $2,750,811. AR 753.

On October 26, 2012, Plaintiff appealed TrailBlazer's redetermination decision to the Medicare Qualified Independent Contractor ("QIC"). AR 1625-1641. The QIC initially reversed Trailblazer's denials of several claim and the validity of the statistical sampling, but reopened its decision when Health Integrity supplied additional documentation supporting the statistical sampling. AR 799-835. After reviewing the sampling documentation, the QIC reinstated the extrapolated overpayment determination. AR 837-875.

On May 2, 2013, Plaintiff appealed the QIC's decision to the Administrative Law Judge ("ALJ") at the Office of Medicare Hearings and Appeals ("OMHA"). AR 7672-76786. A hearing was held by teleconference on September 22, 2014. AR 7704-7849.

On October 28, 2015, the ALJ issued a partially favorable decision wherein she reversed some of the claim denials, found that Dr. Galindo was liable for the overpayment in accordance with sections 1870(b) and 1879 of the Act, and upheld the statistical validity of the sampling methodology, but instructed the contractor to recalculate the extrapolated overpayment so as to achieve a more precise estimate. AR 359-386. The ALJ later reopened her decision to correct some typographical errors and issued a revised decision dated December 9, 2015. AR 169-172. Overall, the ALJ affirmed the denial of 43 services, reversed 6 denials, and found that 1 service was payable at a lower CPT code. AR 376-376. Dr. Galindo filed an appeal and the CMS contractor requested review by the MAC of the ALJs decision. AR 104-343, 344-358.

On March 21, 2016, MAC issued decision reversing the ALJ's determination, as to the precision of the overpayment estimate, but affirmed all of the unfavorable aspects of the ALJ's decision, including the 43 coverage denials. AR 4-87. The MAC determined that the statistical sample and overpayment extrapolation was valid. AR 86. The MAC determined that the EPO and related injection services appealed were not reasonable and necessary and not covered by Medicare. *Id.* The Mac also determined that the physician E&M services were not covered at CPT code 99214, but were covered as CPT code 99213. *Id.* Finally, the MAC found that Dr. Galindo was financially liable for the non-covered services under section 1879 of the Act. *Id.*

(D.E. No. 22 at 4–7.)

## II. Statutory and Regulatory Framework [2]

### A.      The Medicare Program and the Roles of Medicare Contractors

The Medicare program is a federal health insurance program for the aged and disabled that is administered by the Secretary through the Centers for Medicare and Medicaid Services (CMS). *See* 42 U.S.C. § 1395 *et seq.* The program is divided into four parts. *Id.* Medicare Part B, at issue here, covers physician services, including drugs that are usually administered by a physician (like many injections) rather than self-administered (like most pills). 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2)(A).

---

[2] This section is from Defendant's Motion for Summary Judgment and is consistent with Plaintiff's summary of the program (*see* D.E. 19 at 2–4).

CMS contracts with private entities to carry out the daily administrative functions of Medicare reimbursement, such as claims processing and also program integrity functions, such as determinations as to whether payment should not have been made under Medicare. *See* 42 U.S.C. § 1395kk-1; 1395ddd.

Several contractors were involved in the development, calculation, and adjudication of Dr. Galindo's overpayment. During the relevant time period, Trailblazer Health Enterprises (Trailblazer) was the Medicare Administrative Contractor responsible for processing Dr. Galindo's claims. 42 U.S.C. § 1395kk–1 (a)(1). TriCenturion, a Program Safeguard Contractor (PSC), and later, Health Integrity, LLC (Health Integrity), a Zone Program Integrity Contractor (ZPIC) were responsible for performing program integrity tasks such as fraud and overpayment investigations on behalf of the Secretary. 42 U.S.C. § 1395ddd(a). Q2 Administrators was the Qualified Independent Contractor (QIC) that conducted the second level of administrative review of appeals of claim denials. (*i.e.*, reconsideration). 42 U.S.C. § 1395ddd(a)(2)(A).

## B.  Local Coverage Determinations

The Medicare statute explicitly provides that "no payment may be made under . . . part B . . . for any expenses incurred for items or services," including drugs, "which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id.*: § 1395y(a)(1)(A). The determination of whether a service was "reasonable and necessary" may be determined in several ways. CMS may issue national coverage determinations ("NCDs") binding throughout the Medicare system. Or, CMS may issue program and regulatory guidance. Medicare Administrative Contractors may issue local coverage determinations ("LCD") for their geographic region. 42 U.S.C. § 1395ff(f)(2)(B)). Finally,

decisions may be made on case-by-case basis, if none of the prior authorities apply.

LCDs "set regional coverage determinations that govern in the absence of or as an adjunct to a national policy" and "help to ensure that similar claims are processed in a consistent manner within those jurisdictions." *United States v. De Los Rios*, No. 10-20527, 2011 WL 346087, at *4 (S.D. Fla. Feb. 1, 2011) (citations omitted).

LCDs are the product of extensive physician input and public comment. Before adopting a new LCD, a Medicare contractor must provide notice and a 45-day comment period. Medicare Program Integrity Manual (MPIM), CMS Pub. 100-08, Ch. 13, §§ 13.7.2; 13.7.4. During that time, the contractor must solicit comments from providers that may be affected by the LCD, from societies of the relevant medical specialties, and from the general public. *Id.* The contractor must also submit the LCD for review by an advisory committee "composed of physicians, a beneficiary representative, and representatives of other medical organizations." *Id.*; §§ 13.7.4.1; 13.8.1.2. Thus, "[i]n general, an [LCD] embodies the majority view of local health care providers regarding the medical necessity of a certain good or service." *De Los Rios*, 2011 WL 346087, at *4 (quoting *Arruejo*, 2001 WL 1563699, at *4); *see* AR 401-402.

ALJs and the MAC are not bound by contractor LCDs "or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). "If an ALJ or MAC declines to follow a policy in a particular case, the ALJ or MAC decision must explain the reasons why the policy was not followed." 42 C.F.R. § 405.1062(b). A "decision to disregard such policy applies only to the specific claim being considered and does not have precedential effect." *Id.* "An ALJ or MAC may not set aside or review the validity of an [LCD] for purposes of a claim appeal. 42 C.F.R.

§ 405.1062(c). "An ALJ or the DAB [Departmental Appeals Board] may review or set aside an [LCD] in accordance with part 426 of this title." *Id.*

**C.      LCD L8850 and Article for Synthetic Erythropoietin Substitutes (A26242)**

LCD L8850, issued by Trailblazer, provides coverage requirements for "Synthetic Erythropoietin Substitutes," including claims for EPO injections. AR 392-405. In relevant part, the LCD states that it applies to claims for EPO billed to Medicare using CPT/HCPCS code J0885 (Epoetin alfa, non-ESRD). The LCD limits coverage of supplemental EPO to cases when "reasonable and necessary for the patient's condition." AR 394.

For patients with "chronic renal insufficiency" who are not receiving dialysis, the LCD limits EPO coverage as follows:

> • Medicare will cover [EPO] use for this indication when the anemia is symptomatic and the pre-treatment HCT level is 33 percent or less and there is evidence that the anemia is due to chronic renal insufficiency, such as an elevated creatinine level or a reduced creatinine clearance indicative of chronic renal insufficiency.
>
> • The pre-treatment HCT level should be obtained within one week of the initial [EPO] injection.
>
> • Subsequent HCT levels should be obtained within one month of the next [EPO] injection.
>
> • The patient may be treated until the hematocrit level reaches a target range of 30-36 percent. As the hematocrit level approaches 36 percent, [EPO] administration should be reduced to maintain that level of HCT. Because of the natural variability in hematocrit, Medicare will not cover supplemental [EPO] use for subsequent HCT levels of 37.5 percent or higher as determined by a 90-day rolling average of hematocrit levels. (In effect January 1, 2006 until March 18, 2007) OR Withhold the dose of [EPO] if the hematocrit exceeds 36 percent. (In effect March 19, 2007). AR 394.

The LCD also refers to a related policy article A26242 (Article), which provides that reasons for denial include "[a]ll other indications not listed in the 'Indications and Limitations of Coverage' section of this policy." AR 402.

8

Under "Documentation Requirements," the LCD sets forth requirements to satisfy coverage

requirements.  AR 400-401.  In relevant part, those requirements state:

**All [EPO] Patient Medical Records Must Include:**

• Date of the patient' s most recent HCT or Hgb;
• Most recent HCT or Hgb level prior to initiation of [EPO] therapy;
• Date of most recent HCT or Hgb level prior to initiation of [EPO] therapy;
• Patient 's weight in kilograms; and,
• Patient's starting dose per kilogram.

**For Non-ESRD Patients:**

The physician responsible for services must make a comprehensive assessment that usually

includes the above requirements and the following:

• Occult blood loss has been excluded:
• Serum iron, transferrin saturation, and serum ferritin;
• Patient's most recent serum creatinine, within the last month, prior to initiation of
  EPO/DPO therapy: and
• Patient's starting dose per kilogram (The usual starting dose is 50-100 units per kilogram).

AR 400.  The LCD also notes that, "documentation supporting the medical necessity of EPO and

DPO should be legible, maintained in the patient's medical record, and must be made available to

Medicare upon request."  AR 401.

The LCD lists the Sources of Information and Basis for Decision and notes that "policy was

developed in cooperation with advisory groups, which includes representatives from various

specialties."  AR 401-402.  The sources L8850 included:

• Agency for Healthcare Quality. Uses of Epoetin for Anemia in Oncology. Evidence Report
  Technology Assessment Number 30. March 2001.

• Erythropoietin Revisited. The Medical Letter. 43 (1104): 40-41, May 14, 2001.

• Darbepoetln (Aranesp)- a long acting erythropoietin. The Medical Letter, 43(1120)
  December 10, 2001.

9

• Micromedex-Thomson Healthcare, Epoetin, systemic In Drug Infonnallon for the Health Care Professional: USP-01, 2001.

A 4-month comment period was provided and an advisory committee met on October 17, 2001.  AR 402.

## D.  Evaluation and Management Services under CPT 99213 and CPT 99214

The MAC noted the HCPCS and CPT Codebook (2006) provided long descriptions for CPT codes 99214 and 99213 as follows:

### CPT Code 99214 - Office/Outpatient Visit, Est.

Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: a *detailed* history; a *detailed* examination; medical decision making of *moderate* complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of *moderate to high* severity. Physicians typically spend *25* minutes face-to-face with the patient and/or family.

### CPT Code 99213 - Office/Outpatient Visit, Est.

Office of other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: an *expanded problem focused* history; an *expanded problem focused* examination; medical decision making of *low* complexity. Counseling and coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually the presenting problem(s) are of *low* to moderate severity. Physicians typically spend *15* minutes face-to-face with the patient and/or family.

AR 35-36 (emphasis by the MAC).  The MAC noted that the 1995 Documentation Guidelines for Evaluation and Management Services (Guidelines)(AR 88-104) explains the importance of medical record documentation in the course of caring for a patient and define and provide documentation guidelines for three key components of an E&M service, *i.e.*, the history, examination, and medical decision making, which are based upon CPT descriptors.  AR 36.

10

E.      **Statistical Sampling for Extrapolating Overpayment Determinations**

        The Social Security Act permits the use of extrapolation to determine overpayment amounts

if the Secretary determines that either there is a sustained or high level of payment error.  Act §

1893(f)(3); 42 U.S.C. § 1395ddd(f)(3).  The Medicare Program Integrity Manual (MPIM) outlines

the steps required in conducting statistical sampling which include: (1) selecting the provider or

supplier; (2) selecting the period to be reviewed; (3) defining the universe, sampling unit, and

sampling frame; (4) designing the sampling plan and selecting a sample; (5) reviewing each of the

sampling units and determining if there was an overpayment or an underpayment; and as applicable,

and (6) estimating the overpayment.  MPIM, CMS Pub. 100-08, Ch.3, § 3.10.1.3.4.6.[3]  The purpose

of the manual instructions is "to ensure that a statistically valid sample is drawn and that statistically

valid methods are used to project an overpayment where the results of the review indicate that

overpayments have been made."  MPIM, Ch.3, § 3.10.1.1.

        The universe and sampling frame will usually cover all relevant claims or line items for the

period under review.  MPIM Ch. 3, § 3.10.3.2.  For Part B claims, the universe will consist of all

fully and partially paid claims submitted by the provider for the period under review.  MPIM Ch. 3,

§ 3.10.3.2.1.  The "sampling frame" is the "listing" of all possible sampling units from which the

sample is selected.  MPIM Ch. 3, § 3.10.3.2.3.  "The frame may be, for example, a list of all

beneficiaries receiving items for a selected supplier, a list of all claims for which fully or partially

favorable determination have been issued, or a list of all the line items for specific items or services

for which fully or partially favorable determination have been issued."  *Id.*  Sampling units are the

_____

        [3] Defendant's brief cites to the MPIM provisions in effect at the time of the sampled
services, which were in MPIM Chapter 3, until transferred to MPIM Chapter 8, effective June 28,
2011

"elements that are selected according to the design of the survey and the chosen method of statistical sampling." MPIM Ch. 3, § 3.10.3.2.2.

Sampling units may be an "individual line(s) within claims, individual claims, or clusters of claims (*e.g.*, a beneficiary)." *Id*. Medicare contractors have flexibility in using common sampling designs, including: "simple random sampling, systematic sampling, stratified sampling, and cluster sampling, or a combination of these." MPIM Ch. 3, § 3.10.4.1. Simple random sampling involves using a random selection method to draw a fixed number of sampling units from the frame without replacement, *i.e.*, not allowing the same sampling unit to be selected more than once. MPIM Ch.3, § 3.10.4.1.1. Regardless of the method of sample selection used, the contractor shall follow a procedure that results in a probability sample. MPIM, Ch. 3, § 3.10.2. The contractor must maintain complete documentation of the sampling methodology that was followed. MPIM Ch. 3, § 3.10.4.4. CMS Ruling 86-1, *Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers* (Feb. 20, 1986), sets forth the agency's policy regarding the use of statistical sampling, including its authority and rationale for conducting sampling as well as certain remedies afforded providers when sampling is used to project an overpayment. CMS Ruling 86-1 also maintains a provider's right to challenge the overpayment, noting that the burden is on the provider to demonstrate that the sample is not statistically valid:

> Sampling does not deprive a provider of its right to challenge the sample nor of its rights to procedural due process. Sampling only creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment. The burden then shifts to the provider to take the next step. The provider could attack the statistical validity of the sample, or it could challenge the correctness of the determination in specific cases identified by the sample (including waiver of liability where medical necessity or custodial care is at issues). In either case, the provider is given a full opportunity to demonstrate that the overpayment determination is wrong.

CMS Ruling 86-1.

CMS explains that the manual instructions provide a "sufficient process" for "conducting statistical sampling to project overpayments," such that an "appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the *sample drawn and conducted*." MPIM, Ch.3, § 3.10.1.1 (emphasis added).  While failure to follow one or more of the manual's requirements may result in CMS's review of a contractor's performance, it "should not be construed as necessarily affecting the validity of the statistical sampling and/or projection of the overpayment."  *Id*.  If a particular probability sample design is properly executed, then "assertions that the sample and its resulting estimates are 'not statistically valid' cannot legitimately be made." MPIM, Ch.3, § 3.10.2.  "In other words, a probability sample and its results are always 'valid.'"  *Id*.

**F.**     **Medicare Administrative Review Process**

Pursuant to 42 U.S.C. § 1395ff(a), the Secretary issued regulations setting forth appeal rights available of an initial determination that a claim does not meet the requirements for Medicare coverage.  *See* 42 C.F.R. § 405, Subpart I.  In most cases if the minimum amount in controversy is met, once an initial determination is made on a claim, a beneficiary or a provider dissatisfied with the determination has the right to appeal Medicare coverage and payment decisions.  If a provider of Medicare services wishes to appeal a Medicare contractor's initial determination, they must proceed through the following five steps:

**1. Redetermination**. A redetermination is an examination of the initial claim decision.  42 C.F.R. § 405.940 *et seq*.

**2. Reconsideration**. A reconsideration is an independent review performed by a Qualified Independent Contractor.  42 C.F.R. § 405.960 *et seq*.

**3. Administrative Law Judge (ALJ) Hearing**. If the minimum amount of controversy is met, a

hearing before an ALJ may be requested.  42 C.F.R. §§ 1002(a)(2), 405.1006(b).

**4. Medicare Appeals Council Review**. If a provider or beneficiary is dissatisfied with an ALJ decision, they may request review by the MAC.  42 C.F.R. § 405.1102(a).  The Council may also decide on its own motion to review a decision of the ALJ.  42 C.F.R. § 405.1110.

**5. Judicial Review in a United States District Court**. Judicial review of the MAC's decision may be requested within 60 days of the decision, if the minimum amount remaining in controversy is met. 42 U.S.C. § 1395ff(b)(1)(E); 42 C.F.R. § 405.1136; 42 C.F.R. § 405.1130.

The MAC's decision is the "final decision" of the Secretary and thus the focus of this Court's review. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.

### III. Standards of Review

"[T]he use of summary judgment as a mechanism for review of agency decisions." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214–15 (5th Cir. 1996).  "Our practice is supported by the commentators:

> The summary judgment procedure is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency. (*Id.*)  "The explanation for this lies in the relationship between the summary judgment standard of no genuine issue as to any material fact and the nature of judicial review of administrative decisions.... [T]he administrative agency is the fact finder. Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more.

*Id.* (citations omitted).  Summary judgment is appropriate where the record shows that no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007).  In the context of cross-motions for summary judgment, the court must review "each . . . motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid–Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir.2001)).  Nevertheless, "[i]f a party fails to properly support an

assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

The Fifth Circuit has not decided the exact issue of whether the appropriate standard of review in cases such as these is confined to 42 U.S.C. § 405(g), which inquires: "(1) whether the [Secretary] applied the proper legal standards; and (2) whether the [Secretary's] decision is supported by substantial evidence on the record as a whole." *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 340 (5th Cir. 2017) (citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)).  The contrary argument is that decisions of this nature should consider, under the Administrative Procedure Act, whether the Secretary's decision is not founded on substantial evidence or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing See 5 U.S.C. § 706(2)(A), (E)).  Although this issue has not been settled by the Fifth Circuit, the court has assumed in recent cases "the APA's arbitrary and capricious standard applies," but only for the sake of argument. *Id.* (citing omitted).  The Fifth Circuit noted that it is unlikely the standard of review makes much difference in such cases. *Id.*; *see also Girling Health Care, Inc.*, 85 F.3d at 215 ("We will not reverse the Secretary's decision unless it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.").

Findings of fact by an administrative agency are reviewed for substantial evidence. *River City Care Ctr. v. U.S. Dept. of Health and Human Servs.*, No. 15–60315, 647 F. App'x 349, 352 (5th Cir. Cir. April 28, 2016) (unpublished).  "Substantial evidence is deferential to the agency, and it requires only 'more than a mere scintilla' of evidence." *Id.* (citing *Lewis v. UNUM Life Ins. Co. of*

*Am.*, 188 F. App'x 259, 263 (5th Cir. 2006)). "Stated differently, it only requires sufficient evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citing 42 U.S.C. § 1320a–7a(e)). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g).

A federal court applies de novo review to the Secretary's *determinations* of questions of law, but it defers "to the Secretary's interpretation [of the agency's regulation] unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Elgin Nursing and Rehab. Ctr. v. U.S. Dep't of Health and Human Servs.*, 718 F.3d 488, 491 (5th Cir. 2013) (alterations in original) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir. 2004)). However, deference is not warranted when an agency is interpreting its own interpretation of a regulation. *Elgin Nursing and Rehab. Ctr.*, 718 F.3d at 493.

The parties do *not* dispute as a general matter the application of the standard of review as set forth in 42 U.S.C. § 405(g)—*i.e.*, the inquiry into whether substantial evidence supports the MAC's decision and whether it applied the proper legal standard. In their subsequent briefing, the parties get into a dispute about the interplay between Rule 56, which governs motions for summary judgment and the inquiries found under 42 U.S.C. § 405(g), as well as the type of deference, if any, should be used by federal courts when reviewing administrative proceedings.[4]

---

[4] Plaintiff argues in his reply brief that "the Secretary demands unfettered deference with respect to the Council's interpretation of the applicable legal standards,"citing *Elgin Nursing and Rehab. Ctr.*, 718 F.3d 488 (5th Cir. 2013), in support. In response, Defendant argues that the courts generally accord *Skidmore* deference to the Secretary's interpretations of CMS manuals, citing *Baylor County Hospital District v. Price*, 850 F.3d 257, 261 (2017), which cites *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The undersigned observes that these "deference" arguments are not germane to the issues at hand. Plaintiff's arguments focus on the MAC's alleged failure

The undersigned finds that these disputes do not affect the Court's ability to dispose of this particular proceeding. For example, one of the disputes is about how to determine whether the MAC *applied* the proper legal standards. According to Plaintiff, the Secretary improperly attempts to reduce this prong of the standard of review to a simple matching exercise, whereby the Court must simply verify that the Council cited the correct legal standards, which Plaintiff argues would effectively neuter the Court's role in reviewing agency decisions and insulate the Council's actions from meaningful judicial review. Defendant argues that it is evident the MAC applied the proper legal standards to the issues Plaintiff appealed, which involved provisions of the MPIM to determine that the contractor's had established a statistically valid sample, the provisions LCD L8850 and Article for Synthetic Erythropoietin Substitutes (A26242) to the Erythropoietin injection coverage claims, the Current Procedural Terminology ("CPT") Manual Evaluation and Management Services, and Section 1879 of the Act to the waiver issue. Although Plaintiff contends the Council misapplied these provisions, it is undisputed by either party that these were the "correct" or "proper" standards to evaluate the evidence.

The undersigned reiterates that some of these smaller disputes about the nuances of the standards of review are not material to the outcome of this case and do not impact this Court's ability to dispose of this case fairly and appropriately under the applicable standards of review. As will become clear as this Report progresses, the undersigned agrees with Defendant's argument that unfavorable conclusions by the MAC do not necessarily equate to a *failure to apply the correct legal*

---

to apply the proper legal standards, and Defendant argues that the MAC did apply them properly. Plaintiff has never raised issues about the MAC's interpretation of the legal standards or raised any challenges to the legal standards and regulations themselves. Moreover, as a general matter, the parties do not dispute the standard of review under § 405(g) in their original summary judgment motions.

*standards*.   Another way of viewing it is that Plaintiff attempts to characterize unfavorable

conclusions and findings of fact as matters of legal error, when many of Plaintiff's issues more

accurately turn on whether substantial evidence supports the MAC's conclusion and final decision.

### IV.  Analysis, Findings, and Conclusions

#### Issue 1

#### *Arguments*

In his first issue, Plaintiff argues that the final agency decision should be reversed because

the MAC did not correctly apply Medicare requirements for statistical sampling and failed to address

Plaintiff's central argument, as follows:

> The Council committed reversible error by failing to properly apply the provisions
> of the MPIM governing the contractor's execution of a sample design. The manual
> states: If a particular probability sample design is properly executed, i.e., defining the
> universe, the frame, the sampling units, using proper randomization, accurately
> measuring the variables of interest, and using correct formulas for estimation, then
> assertions that the sample and its resulting estimates are 'not statistically valid'
> cannot legitimately be made. MPIM Ch. 3 at § 3.10.2 (emphasis added).  It therefore
> follows that, in cases where a contractor has not properly executed its chosen sample
> design by incorrectly defining the universe and sampling units, for example, then
> such a failure would create a legitimate basis to conclude that the sample and its
> resulting estimates are not statistically valid.
>
> In this case, the record unequivocally reflects that the contractor limited the universe
> of claims to only paid *claim lines* (i.e., individual services). The sample design
> document created by TriCenturion, the contractor that initially constructed the
> sample, stated:
>
>> All ***paid claim lines*** were extracted for Eugenio G. Galindo, MD (8676B0)
>> with dates of service between 01/01/2006 and 03/31/2008, and paid between
>> 01/01/2006 and 03/31/2008. The universe was further restricted to claims with
>> HCPCS [code] J0885. AR 00420 (emphasis added).
>
> A claim for services can consist of both paid and unpaid services, in which case the
> claim would qualify as partially paid. By removing the unpaid service lines from the
> universe, the contractor effectively converted all of the partially paid claims into fully

paid.

The contractor's error of removing the unpaid claim lines from the universe has three consequences, all of which directly bear on the statistical validity of the extrapolated overpayment. First, by effectively removing the partially paid claims from the universe, the contractor deviated from binding MPIM guidance which states:

The universe [of claims for Part B cases] ***shall*** consist of all fully ***and*** partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed. For example, if the review is of Physician X for the period January 1, 2002 through March 31, 2002, and laboratory and other diagnostic tests have been selected for review, ***the universe would include*** all fully and partially paid claims for laboratory and diagnostic tests billed by that physician for the selected time period. MPIM Ch. 3 § 3.10.3.2.1(B) (emphasis added).

The contractor's removal of the unpaid claim lines from the universe also necessarily means that the sampling units were not defined correctly. The MPIM provides that the contractor may designate any type of sampling unit to be reviewed, "...***as long as*** the total aggregate of such units covers the population of potentially mis-paid amounts." MPIM Ch. 3 § 3.10.3.2.2 (emphasis added). Here, the contractor designated the sampling unit as the claim. AR 00416. A non-paid claim line as contained in an otherwise partially paid claim could certainly constitute a "potentially mis-paid amount." By converting the partially paid claims into fully paid claims and designating the sampling unit as the claim, the contractor has rendered it impossible for the sampling units to cover the population of potentially mis-paid amounts.

The record thus also reflects that the contractor failed to adhere to § 3.10.3.2.2. The variable of interest at issue in the extrapolation process here was the payment amount(s) for the claim(s). The contractor stated the following in its sample design document:

> Our review objective was to examine a statistically valid random sample of Medicare Part B payments made to Dr. Eugenio Galindo, PIN 8676B0, over the 27-month period of January 1, 2006 through March 31, 2008 to determine if the payments were appropriate for the services rendered. AR 00709.

The contractor's removal of unpaid claim lines from the universe necessarily means that it was not able to accurately measure the variable of interest – the claim payment amounts – in this case. The three consequences stemming from the contractor's erroneous exclusion of unpaid claim lines from the universe implicate the statistical validity of the sampling methodology under § 3.10.2 because it means that the contractor did not properly execute its chosen sample design in compliance with MPIM directives. Dr. Galindo presented this argument as part of his request for

Council review. AR 00129-00133. In response to Plaintiff's argument, the Council largely sidestepped this issue:

> The appellant's argument that the contractor excluded underpayments or zero dollar payments from the universe does not present a basis for invalidating the statistical sample as drawn and conducted in this case. First, the ZPIC's definition of claims in the universe is consistent with CMS authority on statistical sampling methodology [in § 3.10.3.2 and § 3.10.3.2.3]…Finally, the PSC's description of the universe as 'paid claim lines' does not exclude the possibility of lines of service in a claim that actually represent underpayments or zero paid dollar amounts to the appellant. In fact, the amounts of any underpayments in sampled claims will be used to offset overpayment amounts in calculating the average overpayment on the sample claims and extrapolating to the point estimate under the sampling guidelines. The Council also notes that the decision to exclude underpayments or zero payment amounts also account for the uncertainty of whether or not the appellant appealed denied services that were subsequently paid during the Medicare appeals process.
>
> …The purpose of the statistical sample is to determine potential overpayments. It is unsurprising that the PSC would select payments to the appellant as a basis for reviewing whether the appellant has been overpaid. But this does not mean that the PSC, contractor, or ALJ do not identify underpayments in the sample to be used to offset overpayments. The Council finds no basis for invalidating the statistical sample because the sample  universe consists of claims with positive amounts of monies previously paid.
> AR 00046-00047.

The Council thus fundamentally mischaracterizes Dr. Galindo's principal contention as to the statistical invalidity of the extrapolation and instead substitutes a "Straw Man" argument regarding potential underpayments. Dr. Galindo did not contend before the Council – and does not argue here – that the contractor was required to include non-paid claim lines in the universe because such services could represent potential underpayments to him. Instead, he respectfully submits that the contractor's error necessarily and unequivocally implicates the statistical validity of the sampling methodology according to the plain language of § 3.10.2.19.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Medicare sampling directives contain mandatory guidelines for contractors to follow when defining the universe of claims and the sampling units. The failure to follow such rules renders the sampling methodology statistically invalid according to the MPIM. The Council did not offer *any* explanation or rationale whatsoever for upholding the use of extrapolation where the contractor

> failed to comply with several critical manual provisions decision that the sampling methodology is statistically valid is erroneous as a matter of law and must be reversed.

(D.E. No. 19.)

The Secretary argues that the conclusion that the sampling methodology was valid is supported by substantial evidence. First, the Secretary asserts that the record supports the presumption that the sampling and extrapolation were valid, as follows:

> Substantial evidence in the record supports MAC's determination that the sampling methodology and extrapolation of the overpayment for services conformed to the MPIM instructions and was valid. The MPIM outlines the steps required in conducting statistical sampling which include: (1) selecting the provider or supplier; (2) selecting the period to be reviewed; (3) defining the universe, sampling unit, and sampling frame; (4) designing the sampling plan and selecting a sample; (5) reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and as applicable, and (6) estimating the overpayment. MPIM, Ch.3, § 3.10.1.3.4. If a particular probability sample design is properly executed, then "assertions that the sample and its resulting estimates are 'not statistically valid' cannot legitimately be made." MPIM, Ch.3, § 3.10.2.

> The MAC extensively reviewed sampling methodology and extrapolation developed by TriCenturion and further implemented by Health Integrity. AR 8-14, 44-46. The sampling methodology's compliance with the MPIM was validated by Health Integrity's Chief Statistician, Trailblazer, Q2A, and, in relevant part, the ALJ. AR 9-10, 13, 44-46, 373, 430-444, 797, 857-858; Defense Exhibits A, E, G. A copy of Defendant's Exhibits A – G is attached. The MAC relied on the expert of opinion of Aimee Mason, Ph.D., Chief Statistician, of Health Integrity, who concluded that the statistical sampling work of both the PSC and the ZPIC "is statistically valid in all essential respects and follows" MPIM guidelines. AR 46, Def.'s Ex. A. After reviewing all of documentation, the MAC independently concluded that:

>> If, as in this case, **the ZPIC used a sample methodology that complies with the provisions of CMS Ruling 86-1 and the Medicare Program Integrity Manual,** then the question is not whether another statistician might construct a different or more precise sample, using a somewhat different stratification. Rather, "an appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted." MPIM Ch. 3, § 3.10.1.1.

AR 46 (emphasis added). The MAC's determination is supported by substantial evidence in the record, which includes the documents reviewed by the MAC and set forth in the Defendant's Exhibits.

Second, the Secretary argues that Plaintiff has not met its burden to demonstrate the statistical

sampling is invalid, as follows:

> Dr. Galindo failed to carry his burden of showing that the statistical sample was invalid, and not simply that "another statistician might construct a different or more precise sample." *John Balko & Assocs., Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 555 Fed.Appx. 188, 194 (3d Cir. 2014). Speculative assertions or hypotheticals are not sufficient to meet Dr. Galindo's burden to show the actual statistical sampling to be invalid. *Chillicothe Chiropractic and Wellness Ctr. v. Sebelius,* No. 2:12-cv-330, 2014 WL 1382478 *8 (S.D. Ohio April 8, 2014). An appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted. MPIM Ch. 3, § 3.10.1.1; *Maxxim Care EMS, Inc. v. Sebelius*, No. H–10–14082011, WL 5977666 at *3 (S.D. TX 2011).

> Dr. Galindo's allegation, based on the opinion provided by Ross Cox, Ph.D., that the contractor's choice of paid claims for sample units is an insufficient basis for invalidating the statistical sample. Plaintiff argues that the MAC ignored or misconstrued this argument regarding the validity of the sample. This is incorrect.

> The MAC fully acknowledged and framed plaintiff's argument. AR 00020-00022, 00043-00047. The MAC expressly noted that, Dr. Galindo "argues that '[b]y excluding the non-paid claim lines from the universe, [the ZPIC] has failed to utilize a statistically valid method of extrapolating the overpayment.'" AR 21. The MAC further recognized that, Dr. Galindo "argues that the ZPIC violated this MPIM provision in three ways: (1) the universe is not correctly defined because non-paid service lines, including partially paid claims, were excluded; (2) the sampling units, as defined, do not cover the population of potentially mis-paid amounts; and (3) the variable of interest at issue (payment amount) is not accurately measured because non-paid lines are not included.'" *Id.* The MAC stated, "the appellant's primary argument concerning sample invalidity is that the statistical sample is invalid because the ZPIC limited the universe to claims (and claim lines) with positive payment amounts…. The Council finds [this argument] unavailing." AR 46. The MAC did not disregard or misconstrue the Dr. Galindo argument; the MAC analyzed the argument and rejected it. AR 45–46.

> The MAC's rejection of Dr. Cox's theory is fully supported by language in the MPIM. The MAC recognized that the contractor's definition of the sampling unit

was consistent with CMS's authority on statistical sampling methodology. AR 46. The MAC noted that, for purposes of discussing statistical sampling, that the sampling unit is a provider or supplier's "claim." AR 46; *see also* MPIM, Ch. 3, § 3.4.3.2. The MAC found that, the universe of Part B claims "shall consist of all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed," and "the sample frame may list claims or line items 'for which fully or partially favorable determinations have been issued ....'" AR 46; *see also* MPIM, Ch. 3, § 3.4.3.2.1.B, § 3.4.3.2.3. The MAC found that TriCenturion use of "claims" as the universe and paid claim lines from the universe as the sample frame was consistent with the MPIM:

> Finally, the PSC's description of the universe as "paid claim lines" does not exclude the possibility of lines of service in a claim that actually represent underpayments or zero paid dollar amounts to the appellant. In fact, the amounts of any underpayments in sampled claims will be used to offset overpayment amounts in calculating the average overpayment on the sample claims and extrapolating to the point estimate under the sampling guidelines. MPIM, Ch. 3, § 3.10.5.1. The Council also notes that the decision to exclude underpayments or zero payment amounts also account for the uncertainty of whether or not the appellant appealed denied services that were subsequently paid during the Medicare appeals process.
>
> As CMS notes, "[i]n principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mis-paid amounts." MPIM, Ch. 3, § 3.10.3.2.2. The purpose of the statistical sample is to determine potential overpayments. It is unsurprising that the PSC would select payments to the appellant as a basis for reviewing whether the appellant had been overpaid. But this does not mean that the PSC, contractor, or ALJ do not identify underpayments in the sample to be used to offset overpayments. Indeed, as the appellant notes in its arguments concerning coverage, it is conceivable that a contractor may pay a claim line initially and, on review, determine that the paid claim line may be underpaid, with a resulting "upcoding" to a higher reimbursement level. *See, e.g.*, Exh. MAC-3E, at 13, 18. The Council finds no basis for invalidating the statistical sample because the sample universe consists of claims with positive amounts of monies previously paid.

AR 47.

The MAC has consistently rejected similar "underpayment arguments" in other statistical sampling cases. See, *Dynamic Rehabilitation Services,* No. M-12-24, 2012

WL 889270 (H.H.S. 2012) * 14-17; *Matthew Block, MD*, No. M-12-196, 2012 WL 889394 (H.H.S. 2012) *15; *Border Ambulance Service, LLC.*, No. M-10-1855, 2010 WL 7209455 (H.H.S. 2010) * 8.

Indeed, the MAC has rejected underpayment arguments based on Dr. Cox's same analysis. *John Balko & Associates*, No. M-12-392, 2012 WL 1671497 at *17 (H.H.S. 2012). Upon judicial review, the district count found that, "the MAC's decision that the exclusion of zero dollar payments was permissible, is supported by substantial evidence. *John Balko & Associates v. Sebelius*, No. 12-cv-0572 (W.D. Penn. 2012), affirmed, *John Balko & Associates v. Sebelius*, 555 Fed.Appx. 188 (3rd. Cir. 2014). As the MPIM emphasizes, a challenge to "the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted." MPIM, ch. 3, § 3.10.1.1. Manual authority also provides that medical review of claims that are in a sample must account for underpayments. *Id.* § 3.10.5.1. Accounting for an underpayment appearing in a sample is [a] distinct requirement from the theory advanced by Dr. Cox, that a sample universe must somehow be designed to actively review all denied claims in order to capture underpayments. The MPIM provides acceptable methodologies for a reasonably economical and efficient review of an appellant's payment history.

The fact that a contractor may have selected sample claims by a process that another statistician may not prefer, does not provide a basis for invalidating the sampling or the extrapolation as actually drawn and conducted. To hold otherwise would ignore real world constraints imposed by conflicting demands on limited public funds – constraints that CMS chose to incorporate into the guidelines. Courts have also said that real-world constraints should inform the process. *See, e.g., Transyd Enterprises, L.L.C. v. Sebelius*, No. M-09-292, 2012 WL 1067561 *5 (S.D. Tex. March 27, 2012).

(D.E. No. 23.)

### *Findings and Conclusions*

The undersigned finds that the record reflects that the MAC applied the proper legal standards, and it is evident that the MAC's decision on this issue is supported by substantial evidence. Nor is there any basis for concluding that the MAC ignored or misconstrued Plaintiff's arguments.

As pointed out by the Secretary, the MAC decision sets forth Plaintiff's precise arguments and the applicable law, as well as explains the MAC's reasoning and the evidence it relied on in

reaching its decision on this issue. Just because the MAC disagreed with Plaintiff's arguments does not mean the MAC failed to apply the proper legal standards or that its decision is unsupported by substantial evidence—or otherwise serves as a proper reason for remand or reversal.

As explained by the Fifth Circuit recently, the "MPIM section 8.4.1.1 makes clear that a contractor's failure 'to follow one or more of the requirements contained herein does not necessarily affect the validity of the statistical sampling that was conducted or the projection of the overpayment.'" *Maxmed Healthcare, Inc.*, 860 F.3d at 341. "Instead, '[a]n appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted.'" *Id.* (citing MPIM § 8.4.1.1.) The Fifth Circuit emphasized that "[s]ection 8.4.1.1 concludes by reemphasizing that a contractor's failure to follow all MPIM requirements "should not be construed as necessarily affecting the validity of the statistical sampling and/or the projection of the overpayment." *Id.*

To that end, Plaintiff's argument that the MAC did not apply the proper legal standards because the contractor did not follow the plain language of § 3.10.2.19 (*i.e.*, the contractor deviated from binding MPIM guidance because the "universe [of claims for Part B cases] ***shall*** consist of all full ***and*** partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed")—and that this error rendered the sampling methodology statistically invalid according to the MPIM—is inconsistent with and undercut by other relevant sections of the MPIM. *See Maxmed Healthcare, Inc.*, 860 F.3d at 341. Plaintiff's "plain language" argument fails to account for other rules that govern the paradigm for sampling and extrapolation.[5] That is, the legal

---

[5] The undersigned also notes that many of Plaintiff's arguments before this Court rely on selective readings of the relevant authorities and attenuated proclamations of *legal* error.

standards are not as rigid as Plaintiff seems to contend. They do not require sampling perfection, and there are a lot of caveats under the manual that underscore the fact that sampling validity is a somewhat more forgiving process, as explained by a number of District Courts under the relevant Medicare rules and authorities. *See Anghel v. Sebelius*, 912 F. Supp. 2d 4, 21 (E.D.N.Y. 2012) ("Failure of a contractor to follow one or more of the requirements contained in the manual would not automatically affect the validity of the statistical sample or any determination of overpayment."); *Miniet v. Sebelius*, 10-24127-CIV, 2012 WL 2930746, at *6 (S.D. Fla. July 18, 2012) (unpublished) ("Importantly, the sampling utilized need not be based on the most precise methodology, just a valid methodology."); *John Balko & Associates v. Sebelius*, 12-CV-0572, 2012 WL 6738246, at *12 (W.D. Pa. Dec. 28, 2012), *aff'd sub nom. John Balko & Associates, Inc. v. Sec. U.S. Dept. of Health and Human Services*, 555 F. App'x 188 (3d Cir. 2014) (unpublished) ("Balko is not entitled to the best possible statistical sample of claims that it submitted to Highmark under Medicare. Instead, Balko is only entitled to a statistically valid random sample."). Plaintiff had the burden to demonstrate the invalidity of the statistical sampling. *See Maxxim Care EMS, Inc. v. Sebelius*, Civ. Action No. H–10–1408, 2011 WL 5977666, at *3 (S.D. Tex. Nov.29, 2011) (noting that the plaintiff challenging the Secretary's final decision regarding the statistical sampling "had the burden to prove the invalidity of the statistical sampling and extrapolation"). This requires more than a showing that "another statistician might construct a different or more precise sample." *John Balko & Assocs., Inc.*, 555 F. App'x at 194. The MAC made this exact point in its final decision. AR 50.

Plaintiff argues in his reply brief that Defendant misconstrues the rules by arguing that there is a presumption that the statistical sampling is valid if the framework is followed. Plaintiff's counter-argument is unconvincing and immaterial because Plaintiff's core argument is that the MAC

committed legal error by failing to follow the statistical instructions to a "T" by ignoring the plain language of § 3.10.3.2.3 of the MPIM.[6] However, the applicable legal standards just discussed and case law undermine that very argument.

In its motion for summary judgment, Plaintiff argues that, because the use of "paid claim lines" does not follow the exact language of the MPIM, it caused a negative chain reaction that might have affected the remainder of the statistical sampling and extrapolation process, which, in turn, might implicate the validity of the statistical sampling. In its written decision, the MAC cited to MPIM Ch. 3 § 3.10.1.1, which explains that a contractor's failure 'to follow one or more of the requirements contained herein does not necessarily affect the validity of the statistical sampling that was conducted or the projection of the overpayment." AR 21. The written decision explains that an "appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and collected." MPIM, Ch. 3, § 3.10.1.1. The failure to follow the precise language of one phrase from one MPIM rule, as Plaintiff argues in this particular case, is not predicated on the "actual statistical *validity* of the sample *as drawn and collected*."[7]

---

[6] Plaintiff argues in his reply brief that the cases relied on by Defendant and his arguments are nothing more than attempt, in general terms, "to obscure an issue that the Council and the Secretary both seem eager to avoid: the contractor's *improper removal of the unpaid services* from the universe necessarily renders the extrapolated overpayment statistically invalid according to the MPIM." (D.E. No. 26 at 5.) Similar to the arguments Plaintiff asserts in his motion for summary judgment, this reply argument seems to contradict the professed issue Plaintiff raises here and raised before the MAC (which Plaintiff says was misconstrued): "Dr. Galindo did not contend before the Council – and does not argue here – that the contractor was required *to include non-paid claim lines in the universe because such services could represent potential underpayments to him*, but instead, he is arguing that "the contractor's error necessarily and unequivocally implicates the statistical validity of the sampling methodology *according to the plain language of § 3.10.2.19*."

[7] The MAC, in its conclusion, recounted that the steps the MPIM outlines for conducting statistical sampling: (1) selecting the provider or supplier; (2) selecting the period to be reviewed;

Moreover, Plaintiff does not argue or attempt to demonstrate that the "bottom line" of the sampling and extrapolation process reflects an erroneous determination of potential overpayments (particularly *as drawn and conducted*).  As the MAC emphasized, the entire purpose of this system for post-payment audits "is to determine potential overpayments."  The MAC also referenced the rule that there is a presumption that the projected overpayment is accurate, which then shifts the burden to Plaintiff to show otherwise, for example, by challenging the validity of the statistical sampling or the overpayment amount.  Although Plaintiff argues that the MAC misapplied the law, which caused a negative chain reaction that tainted the remainder of the statistical and extrapolation process, Plaintiff does not explain in specific terms or with record evidence—such a statistical information from the record—in its motion for summary judgment how that alleged error rendered the statistical sampling invalid *as it was drawn and conducted*.[8]   Instead, Plaintiff asserts speculative proclamations of the effects and consequences of the alleged legal error, but, again, he does not

_____

(3) defining the universe, sampling unit, and sampling frame; (4) designing the sampling plan and selecting a sample; (5) reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and as applicable, and (6) estimating the overpayment. The MAC concluded, under the MPIM, that Plaintiff's arguments were not legitimate because the MPIM does not permit challenges to the statistical validity of the sample and resulting estimates if the steps are followed. AR 50. In essence, Plaintiff complains only that the sample should have been better executed, which underscores the propriety of the MAC's conclusion under the evidence, the MPIM, and other authorities.

[8] For example, Plaintiff asserts that: "Dr. Galindo did not contend before the Council – and *does not argue* here -- that the contractor was required *to include non-paid claim lines in the universe because such services could represent potential underpayments* to him. Instead, he respectfully submits that the contractor's error necessarily and unequivocally implicates the statistical validity of the sampling methodology *according to the plain language of § 3.10.2.19*." (emphasis added).

explain how either invalidated the sampling in some quantifiable or material way.[9]  The Court need not assume, particularly on summary judgment, that the type of legal error Plaintiff complains about actually undermined the validity of the statistical sampling.

As the MAC's decision reflects, Plaintiff's arguments failed to call into doubt the validity of the statistically sampling.  In reaching its final decision on this issue, the MAC recounted the record evidence, such as the sampling methodology and extrapolation developed by TriCenturion, which was further implemented by Health Integrity, and the validation of the sampling's compliance with the MPIM by Health Integrity's Chief Statistician, Trailblazer, Q2A, and, in relevant part, the ALJ.  Further, the MAC pointed to the expert of opinion of Aimee Mason, Ph.D., Chief Statistician of Health Integrity, who concluded that the statistical sampling work of both the PSC and the ZPIC "is statistically valid in all essential respects and follows" MPIM guidelines.  The undersigned finds that the foregoing constitutes substantial evidence to support the MAC's decision on this issue.[10]

---

[9]  For example, Plaintiff argues that "[a] non-paid claim line as contained in an otherwise partially paid claim *could* certainly constitute a 'potentially mis-paid amount.'"  At another point, Plaintiff argues that "[t]he three consequences stemming from the contractor's erroneous exclusion of unpaid claim lines from the universe *implicate* the statistical validity."  Not only does Plaintiff rely on equivocal language in his analysis, but he never explains in his motion for summary judgment how or why the statistical sampling was *actually* rendered invalid, as explained in other portions of this Report.  To the extent Plaintiff could argue that his expert, Dr. Cox, provided this information, the MAC was not *required* to accept Dr. Cox's analysis or conclusions as dispositive. *See Transyd Enterprises, L.L.C. v. Sebelius*, M-09-292, 2012 WL 1067561, at *8 (S.D. Tex. Mar. 27, 2012) (unpublished) ("[T]he Court's role is not to determine which expert was more persuasive on this point, but whether substantial evidence, *i.e.*, less than a preponderance, exists to support the MAC's determination that a [particular expert opinion] on precision does not invalidate TriCenturion's sampling methodology.").

[10]  In his reply brief, Plaintiff argues that it is impermissible for the MAC and the Defendant to rely on this evidence because the Court only reviews the final decision of the MAC.  However, the MAC relied on this record evidence, which was part of the record before the ALJ, and the MAC conducted a de novo review of the written record and expressly included this evidence in its written decision, which makes it part of the MAC's final decision.  AR 44–46.

Moreover, the fact that the MAC did not rely on Plaintiff's expert's testimony as dispositive or compelling (*see* AR 12; 46–47) does not sufficiently call into doubt the validity of the statistically sampling or undermine the substantiality of the evidence supporting the MAC's decision. *See Transyd Enterprises, L.L.C.*, M-09-292, 2012 WL 1067561, at *8 (unpublished) ("[T]he Court's role is not to determine which expert was more persuasive on this point, but whether substantial evidence, *i.e.*, less than a preponderance, exists to support the MAC's determination that a [particular expert opinion] on precision does not invalidate TriCenturion's sampling methodology.").

The MAC also found no error under the applicable legal standards, as argued by Plaintiff to the MAC. The MAC pointed to MPIM Ch. 3, § 3.10.3.2, which states that the CMS assumes, for the purposes of discussing statistical sampling, that "[t]he universe and sampling frame will usually be all relevant claims or line items for the period under review." AR 47. The MAC emphasized that the "amounts of any underpayments in sampled claims will be used to offset overpayments in calculating the average overpayment on the sample claims and extrapolating to the point estimate under the sampling guidelines. AR 47 (citing MPIM Ch. 3, § 3.10.5.1). In other words, as explained earlier in the MAC's decision, a "provider whose claims are being audited is protected from a degree of imprecision and uncertainty by the provision that limits overpayments to the lower level of a ninety percent one-sided confidence interval." AR 46 (citing MPIM Ch. 3, § 3.10.5.1). The MAC also reasoned that the decision to exclude underpayments or zero payment amounts also account for the uncertainty of whether or not the appellant denied services that were subsequently paid during

---

*See, e.g.*, 42 C.F.R. § 405.1100(a) ("When the Council reviews an ALJ's or attorney adjudicator's decision, it undertakes a de novo review."); 42 C.F.R. § 405.1122(a)(1) ("If the Council is reviewing an ALJ's . . . decision, the Council limits its review of the evidence to the evidence contained in the record of the proceedings before the ALJ.").

the Medicare appeals process. AR 47. Lastly, the MAC pointed out the rule, which states that, "[i]n principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mis-paid amounts. AR 47 (citing MPIM , Ch. 3, § 3.10.3.2.2).

In its final conclusion, the MAC concluded that the contractor complied with the steps for sampling and extrapolation, and the MAC emphasized yet again that the guidelines are designed to "offset precision in favor of lower recovery amounts." AR 50. The MAC stated that the "fact that a contractor may have selected sample claims by a process that another statistician may not prefer, does not provide a basis for invalidating the sampling or the extrapolation as actually drawn and conducted, and it stated that "[t]o hold otherwise would ignore real world constraints imposed by conflicting demands on limited public funds – constraints that CMS to incorporate into the guidelines. AR 50.

The well-documented reasoning by the MAC in its written decision undermines Plaintiff's argument that the MAC did not apply the proper legal standards.  The MAC's decision also contradicts Plaintiff's claim that the MAC did not offer "*any* explanation or rationale whatsoever for upholding the use of extrapolation where the contractor failed to comply with several critical manual provisions" because it is evident that the MAC decision addressed the precise nature of all of Plaintiff's arguments.

In sum, Plaintiff fails to prove  that the final decision was the result of improperly applied legal standards.  Moreover, substantial evidence supports the MAC's determination.  For the purposes of summary judgment, Plaintiff's very discrete argument about legal error under one MPIM provision does not raise a genuine issue of material fact or entitle him to judgment as matter of law in light of all the other MPIM provisions that undercut his argument, the MAC's proper application

31

of these rules, and the MAC's express reasoning in the decision *based on the record and evidence before it.* *See Corrosion Proof Fittings v. EPS*, 947 F.2d 1201, 1213 (5th Cir.1991) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U .S. 607, 620 (1966) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's findings from being supported by substantial evidence.").

**Issue 2**

*Arguments*

For his second issue, Dr. Galindo argues that the MAC "committed reversible error by refusing to consider evidence in the record that supports most of the beneficiaries whose claims are at issue in this case suffered from qualifying diagnoses and were therefore eligible to receive EPO injections." (D.E. No. 19 at 15.)  More specifically, Plaintiff explains the issue as follows:

> The Council reviewed the EPO administration claims in three groups: (1) claims where some of the requisite lab values, such as hematocrit or hemoglobin, were allegedly out of range; (2) claims where the issue was whether the documentation supported the beneficiaries suffered from CKD; and (3) claims where the issue was whether the documentation supports the anemia was caused by chemotherapy. AR 00051-00068. The largest group of claims fell into the second category.

> LCD L8850 provides that EPO injections will be covered for beneficiaries who suffer from anemia in CKD, but the LCD does not contain clinical parameters for establishing such a qualifying diagnosis. The LCD merely states:

>> Medicare will cover EPO or DPO use for [anemia in CKD] when the anemia is symptomatic and the pre-treatment [hematocrit] level is 33 percent or less and *there is evidence that the anemia is due to chronic renal insufficiency, such as an elevated creatinine level or a reduced creatinine clearance indicative of chronic renal insufficiency.*

> AR 00394 (emphasis added); P. App. 029-143. The ALJ recognized this ostensible "gap" in the coverage guidelines and invited Dr. Galindo and the contractor to propose a clinical framework to be used for establishing a diagnosis of anemia in CKD to support coverage of EPO injections. AR 00625-00628. The parties

32

subsequently proposed such a framework based upon the National Kidney Foundation Kidney Disease Outcomes Quality Initiative, but the ALJ ultimately elected to focus on the patients' creatinine levels. AR 00584-00623.

As part of his request for review, Dr. Galindo argued before the Council that creatinine levels were not dispositive as to a diagnosis of CKD and that other clinical markers, such as elevated blood urea nitrogen (BUN) values or low carbon dioxide (CO2) levels, could be evidence of CKD. AR 00113-00116. The Council, however, cabined its analysis in a manner similarly narrow to that of the ALJ and rejected Plaintiff's arguments. The Council concluded as to virtually all such claims:

> The Council finds that the record does not establish that the EPO injection is covered by Medicare. ***The LCD refers to creatinine levels in a non-exclusive list of markers to establish a qualifying diagnosis for coverage.*** The record supports that the markers available to and considered by the treating physician at the time of the service was the creatinine level, which fell within a normal range. The subsequent calculation of GFR and reference to other disease markers argued on appeal do not establish the appellant's medical decision-making on the date of service. The Council agrees with the ALJ that the documentation does not support that the EPO and related injection are covered by Medicare.

AR 00056 (emphasis added). While conceding that creatinine levels are part of a "non-exclusive list" of clinical markers of kidney damage, the Council appears principally concerned with the point in time at which the laboratory data and other clinical evidence would have been available to Dr. Galindo. But the administrative record contains evidence of kidney damage that was available to Plaintiff on or before the dates of service in question, which Dr. Galindo discussed in his request for review. The Council did not consider this evidence or otherwise explain why it was insufficient to establish the qualifying diagnoses. This constitutes reversible error because the Council effectively interpreted the LCD to require abnormal creatinine levels to establish a qualifying diagnosis of anemia in CKD. The Council's decision in all such respects is also unsupported by substantial evidence because there were clinical markers available on or before the dates of service in question to support the patients suffered from qualifying diagnoses. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (an agency decision will be considered arbitrary and capricious where it fails to examine relevant evidence or the agency has not articulated a sufficient explanation for its decision); *see also Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir. 2000) (court must review the administrative record as a whole as part of the substantial evidence inquiry).

For example, beneficiary G.R. received an EPO injection on January 30, 2007. On the date of service, Ms. R. was a 75 year-old female whose medical history was

significant for type II diabetes, coronary artery disease, hypertension, renal failure, and anemia in CKD.24 AR 06067. The file contains clinical evidence gathered on or before January 30, 2007 which supports kidney damage and thus a qualifying diagnosis of anemia in CKD. These clinical markers include low $CO_2$ levels (on March 2, 2006 and April 13, 2006), elevated creatinine (on September 26, 2006), and elevated BUN (on September 26, 2006 and the date of service). AR 06263, 06264, 06278, 06281. All of this information was gathered and available on or before the date of service, but the Council steadfastly refused to consider it, concluding simply that:

> The Council finds that the record does not establish that the EPO injection is covered by Medicare. The LCD refers to creatinine levels in a non-exclusive list of markers to establish a qualifying diagnosis for coverage. The record supports that the markers available to and considered by the treating physician at the time of the service was the creatinine level, which fell within a normal range. The subsequent calculation of GFR and reference to other disease markers argued on appeal do not establish the appellant's medical decision-making on the date of service. The Council agrees with the ALJ that the documentation does not support that the EPO and related injection are covered by Medicare.

AR 00058. The Council did not explain, for example, why it would not consider laboratory data that was available on or before the date or service or how such clinical evidence was insufficient to establish a qualifying diagnosis of anemia in CKD given that the clinical markers identified in the LCD are "non-exclusive."

In another case, the Council affirmed the denial of two EPO injections administered to beneficiary C.E. on October 31, 2007 and November 14, 2007. AR 00056-00057. At the time those services were provided, Ms. E. was an elderly 85 year-old female who suffered from Alzheimer's disease and anemia in CKD. Ms. E. resided in a nursing home and was accompanied by her daughter during all appointments with Dr. Galindo. AR 03058-03059. The record reflects several clinical markers of kidney disease, thereby supporting a qualifying diagnosis for the EPO injections. These markers include low $CO_2$ levels (on January 10, 2007) and elevated BUN (on January 10, 2007 and October 10, 2007). AR 02945, 02966. Once again, however, the Council refused to consider this evidence even though it was available prior to the dates of service in question and instead simply copied and pasted the same conclusion it used for all of the qualifying diagnosis claims. AR 00057; *see also* AR 00056-00062.

As these two examples readily illustrate, the administrative record contains clinical evidence of CKD that was available to Dr. Galindo on or before the dates of service to support the patients' qualifying diagnoses. The Council, while observing that

34

creatinine levels were part of a "non-exclusive" list of markers of kidney damage, refused to consider or even discuss this information. This failure constitutes legal error because the Council effectively abdicated its duty to perform a *de novo* review of the issues raised by Plaintiff in his review request. 42 C.F.R. § 405.1100(c). Further, the Council's decision that creatinine levels were the only clinical evidence available on or before the dates of service supporting the qualifying diagnoses of anemia in CKD is not supported by substantial evidence; the administrative record reflects that laboratory data and other clinical markers were gathered and reviewed on or before the dates of service under review. The Council's decision as to all such claims should accordingly be reversed.

(D.E. 19 at 15–19.)

### *Findings and Conclusions*

The undersigned finds Defendant's arguments persuasive on this issue. The undersigned concludes that the MAC did not err as alleged and its findings are supported by substantial evidence.

As Defendant correctly points out, the record contradicts Plaintiff's argument that the MAC "effectively abdicated its duty to perform a *de novo* review of the issues raised by Plaintiff in his review request." Rather, the record reflects that the MAC conducted a de novo review, and it devoted 17 single-spaced pages to reviewing the medical evidence for the multiple individual beneficiaries whose EPO injections were found not reasonable and necessary under LCD L8850. AR 51–86. Moreover, there is no merit to Plaintiff's argument that the MAC did not explain why it would not consider laboratory data that was available on or before the date or service or how such clinical evidence was insufficient to establish a qualifying diagnosis of anemia in CKD given that the clinical markers identified in the LCD are "non-exclusive." Instead, the MAC explained quite clearly that the evidence Dr. Galindo put forth on appeal to justify the services "do[es] not establish the appellant's medical decision-making on the date of service." AR 56. Although Plaintiff argues that the MAC reversibly erred because the Council effectively interpreted the LCD to require

35

abnormal creatinine levels to establish a qualifying diagnosis of anemia in CKD, the MAC clearly explained its reasoning: "The record supports that the markers available to and considered by the treating physician at the time of the service was the creatinine level, which fell within a normal range." AR 56.

The MAC's decision reflects that it considered the evidence and arguments Dr. Galindo presented on appeal for the individual cases. This is illustrated by the MAC's denial of an EPO injection to beneficiary G.R. on January 30, 2007, which Plaintiff complains about in its brief. As pointed about by Defendant, Dr. Galindo's records indicate the patient first visited him in December of 2000 and was treated by him through July 2007. AR 6071-6087. Between January 2003 and July 2007, G.R. received approximately 80 EPO injections. *Id.* According to Dr. Galindo's notes, on January 30, 2007, G.R. presented for a follow up visit and "subjectively, the patient quotes episodes of tiredness and fatigue, **on and off, associated also with some achiness to joint sites** and continues with the use of a cane for adequate ambulation." AR 6067 (emphasis added). The treatment note states: "[G.R.] has significant past medical history remarkable for right-sided breast carcinoma, history of anemia, erythropoietin deficit, which has been on erythropoietin support, diabetes, long-standing, hypertension, coronary artery disease, hypercholesterolemia, and arthritis. AR 6067.9. G.R. had lab tests performed on the day of her visit and the laboratory results listed were: "White count of 5.6, hemoglobin 11.7, hematocrit 34.2, and platelet count of 225 with MCV of 88.1." AR 6067, 6282. However, G.R. had other lab tests run that day, which revealed her creatinine was in the normal range (1.3) and her blood urea nitrogen (BUN) was high. AR 6281. Neither was mentioned in the January 30, 2007 treatment note. AR 6067.

On August 15, 2009, Dr. Galindo wrote a letter to the QIC trying to justify the treatment,

arguing that a complete metabolic panel was done on 01-30-07 and showed the patient's creatinine level to be 1.3 mg/dL. The associated calculated Glomerular filtration rate ("GFR") was 40, which equals to a Stage III chronic kidney disease. GFR is a well-known indicator of the measure of a patient's kidney function. AR 6064. The MAC reviewed of the laboratory results for G.R. and the arguments of Dr. Galindo and the ZPIC. AR 58-59.

As previously explained, the MAC found that "the record does not establish that the EPO injection is covered by Medicare" and that the record supports the conclusion that "the marker available to and considered by the treating physician at the time of the service was the creatinine level, which fell within a normal range." AR 59. "The subsequent calculation of GFR and reference to other disease markers argued on appeal do not establish the appellants' medical decision-making on the date of service." *Id.* "The Council agrees with the ALJ that the documentation does not support that the EPO and related injection are covered by Medicare." *Id.*

On October 31, 2007, and November 14, 2007, EPO shots were administered to C.E.. Although she resided in a nursing home, she had been a patient of Dr. Galindo's since August 2004 and during the course of her treatment she received numerous other EPO injections. AR 2658-2674. According to Dr. Galindo's treatment note, dated October 17, 2007, Patient C.E. "had the underlying diagnosis of history of anemia, chronic iron and erythropoietin deficiency for which patient has been on erythropoietin support. The patient also with history of elevated ferritin level and a history of dementia. He noted that she was a nursing home resident. AR 3075.

As Defendant points out, there is no indication or mention of chronic renal insufficiency or chronic kidney disease in this treatment note. AR 3074-3075. On October 10, 2007, C.E's creatinine level was only .7, which was in the low normal range. AR 2966 . Despite their relevance,

37

there is no mention of creatinine, BUN levels, or symptoms from anemia in this treatment note.  AR 3074-3075, 2966-2968.  C.E. did not see Dr. Galindo on October 31, 2007; she was merely administered the injection.  AR 2671.  On November 14, 2007, C.E.'s creatinine was still in the normal range at .7.  AR 2974.  Additionally, lab reports obtained by the nursing home on November 14, indicated her creatinine was .6 and the report had estimated GFR of 120 (expected value was above 60).  AR 2975.  The MAC noted that, the ZPIC argued that the medical records for this beneficiary, for both dates of service, "did not support a diagnosis or history of [CKD or] symptomatic anemia" or "the presence of condition for which Medicare covers supplemental" EPO. AR 56.  As already explained, the MAC found that the EPO injections for both dates were not covered by Medicare:

> The LCD refers to creatinine levels in a non-exclusive list of markers to establish a qualifying diagnosis for coverage. The record supports that the markers available to and considered by the treating physician at the time of the service were the creatinine levels, which fell within a normal range. The subsequent calculation of GFR and reference to other disease markers argued on appeal do not establish the appellants' medical decision-making on the date of service. The Council agrees with the ALJ that the documentation does not support that the EPO and related injections are covered by Medicare.

As Defendant correctly points out, while Dr. Galindo argues the MAC relied too heavily on creatinine values, it is specifically listed and was the only clinical marker Dr. Galindo used to calculate the estimated GFR.  AR 6066.  Even though Dr. Galindo argues that the MAC should not just consider the medical evidence the physician relied on when prescribing the EPO shots in order to decide if the treatment was reasonable and necessary, the LCD notes that "documentation supporting the medical necessity of EPO and DPO should be legible, **maintained in the patient's medical record,** and must be made available to Medicare upon request." AR 401 (emphasis added).

Dr. Galindo's documentation does not support coverage under the LCD for anemia due to chronic renal insufficiency. Defendant correctly notes that Dr. Galindo does not present any legal authority to support the proposition that physicians are permitted to order treatments without actually having the supporting documentation or information.

The record and the MAC's decision reflects its evidentiary choices and reasoning as to all the individual cases.[11] The MAC was not persuaded by the evidence presented by Plaintiff during the appeal process. This is not a question of legal error or the MAC failing to apply the proper legal standards. Rather, Plaintiff is complaining about unfavorable findings by the MAC. In other words, Plaintiff is complaining about the disposition of the record evidence after it was duly considered and found to be unpersuasive. That makes it a question of substantial evidence. Just because the MAC could have reached a different conclusion under the relevant legal standards does not mean it failed to apply the proper legal standards.

The MAC concluded that Dr. Galindo's documentation did not adequately support the medical necessity for the EPO and other injections and that the record reflects that the markers available to and considered by the treating physician at the time of the service was the creatinine level, which fell within a normal range. Moreover, the MAC found that the subsequent calculation of GFR and reference to other disease markers argued on appeal did not establish Plaintiff's medical

---

[11] In his motion for summary judgment, Plaintiff analyzes only three claims (of many) that the MAC ruled on, and Defendant argues in its cross-motion that "the Court should reject Dr. Galindo's blanket argument that his [many] claims were covered and it should limit its review as to whether the MAC's determination on the merits of the three claims presented for C.E. and G.R. [the ones presented in Plaintiff's motion for summary judgment] is supported by substantial evidence." The undersigned does look at the three claims Plaintiff focuses on his brief, but the undersigned also looks at the MAC's overall reasoning in its decision-making, to the extent Plaintiff is arguing the MAC committed an error of law.

decision-making on the date of service.  All of this constitutes substantial evidence to support the

MAC's decision on this issue.  It is not the role of this Court to reweigh the evidence on judicial

review.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (discussing the review of

administrative decisions in the context of Social Security disability cases).  "Substantial evidence

is deferential to the agency, and it requires only 'more than a mere scintilla' of evidence."  *Id.*

"[F]indings of fact by an administrative agency are reviewed for substantial evidence.  *River City*

*Care Ctr.*, No. 15–60315, 647 F. App'x at 352.    In this case, the MAC's conclusion that Dr.

Galindo's documentation did not adequately support medical necessity for EPO injections and its

consideration of what was the critical factor underlying his medical decision to order the treatment,

are findings of fact, not legal errors.

### Issue 3

#### *Arguments*

For his third issue, Plaintiff argues that the Council's decision does not evince proper

application of CMS guidelines for E&M Services, as follows:

> The ancillary service at issue in this case are the E&M services provided by Dr.
> Galindo. In all such cases, the Council affirmed the reduction or "down coding" of
> the original level of service / code from 99214 to 99213. The Council stated:
>
>> As discussed below, the Council finds that the record does not contain
>> sufficient documentation to support changing the ALJ's determinations. The
>> Council's review of the office visit notes, and the rest of the administrative
>> record, indicates that the appellant has not furnished sufficient documentation
>> to establish coverage for CPT code 99214. Computer generated office visit
>> notes for long-standing patients, with clinical findings that are either identical
>> or reflect immaterial stylistic edits from surrounding office visits, do not
>> establish the level of history, systems review, or medical decision making to
>> establish coverage for CPT code 99214, for each and every visit. This level of
>> documentation does not establish that the history or review of systems claimed
>> were medically reasonable and necessary, for each and every visit. Nor does it

40

necessarily establish that the documentation was not cloned in its essential respects. We note that the appellant did not document the time, which can be a material factor in documenting the level of service claimed. Finally, we note that the appellant has not cited to any authority for the proposition that it is due payment for a higher level of service than it claimed initially.

AR 00070.

The Council's rationale as to the E&M services is flawed because it fails to apply CMS documentation guidelines for E&M services and the relevant administrative authority set forth in the MCPM.

The Council appears to first suggest that Dr. Galindo's E&M notes are insufficient because they were created using "computer generated" templates. But CMS has not issued (and the Council did not cite) any bulletins or other administrative authority prohibiting the use of such templates. *Cf.* MPIM Ch. 3 § 3.3.2.1.1(B) ("CMS does not prohibit the use of templates to facilitate recordkeeping."). The Council also erred insofar as it suggested that Plaintiff's failure to document the time of the E&M visits affected the appropriate level or service or code for each claim. *See* MCPM Ch. 12 § 30.6.1(B) (Pub. 100-04, Rev. 178) (2004) ("The duration of the visit is an ancillary factor and does not control the level of service to be billed unless more than 50 percent of the face-to-face time…is spent providing counseling or coordination of care.").

The primary basis for the Council's unfavorable decisions as to the E&M services appears to be that the contents of the visit notes appear similar to those from notes for different dates of service. The Council notes that the contents of the patient's history and review of systems, for example, are similar from note to note. But, as previously discussed, a physician is only required to establish two out of the three required elements to meet CPT Code 99214: (1) detailed history; (2) detailed examination; (3) medical decision-making of moderate complexity. To the extent that the contents of any notes may appear similar, those similarities pertain primarily to the history portion of the service. In the event any similarities may appear in the examination portion of the notes, a physician cannot forecast in advance the results of a physical examination. Lastly, the medical decision-making sections of the notes reflect facts that address the unique clinical circumstances of each of these medically complex patients. The Council's analysis as to the E&M claims is thus misguided in that it failed to account for the fact that only two of three elements are required to establish coverage for CPT code 99214.

(D.E. No. 19 at 19–21.)

Defendant argues the following in his cross-motion for summary judgment:

Dr. Galindo's Memorandum also quotes [the MAC's conclusion], but it completely ignores the MAC's 3 page overview of the appropriate guidelines and its 12 pages of detailed findings explaining why each of the 8 office visits should be coded at 99213, not 99214. AR 35-38; 70-82. Dr. Galindo phrases this issue as legal issue to avoid the factual merits, but the issue is whether the MAC's 8 determinations are supported by substantial evidence. CMS Ruling 86-1 gives the provider the opportunity "to challenge the correctness of the determination in specific cases identified by the sample."   But, Plaintiff's Memorandum fails to specifically challenge the MAC's factual determinations with respect the 8 individual claims.

Medicare providers bear the burden of demonstrating medical necessity and entitlement to payment. *Clinic Res. Mgmt. v. Burwell*, Civil Action No. H–14–578, 2015 WL 3932657, at *2 (S.D. Tex. June 26, 2015) (citing "42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6)). As noted above, each individual claim should be judge on its own merits and Dr. Galindo failed to meet his burden to demonstrate these 8 office visits were payable under CPT 99214. The MAC's decision was on these 8 claims is supported by substantial evidence and the Secretary is entitled to summary judgment.

(D.E. No. 23 at 29.)

### Findings and Conclusions

The undersigned finds that the final decision about this matter is supported by substantial evidence, and the undersigned rejects Plaintiff's "legal error" argument that the MAC's "decision does not evince proper application of CMS guidelines for E&M Services." First, Plaintiff's claim that the MAC improperly applied the legal standards is speculative to the extent it rests on the premise that the MAC's decision does not "evince" proper application. Plaintiff also attempts to transform this issue into one of legal error by arguing that the MAC "failed to account for the fact that only two of three elements are required to establish coverage for CPT code 99214."

It is apparent from the MAC's decision and Plaintiff's efforts to explain away the MAC's reasons for ruling against Plaintiff on this issue that this is *not* an issue of legal error, but a question of whether substantial evidence supports the MAC's conclusion. The MAC's decision turns on the

record it had before it. The MAC concluded that "the record does not contain sufficient documentation to support changing the ALJ's determinations" and that its own "review of the office visit notes, and the rest of the administrative record, indicates that the appellant has not furnished sufficient documentation to establish coverage for CPT code 99214." The MAC explained that "[c]omputer generated office visit notes for long-standing patients, with clinical findings that are either identical or reflect immaterial stylistic edits from surrounding office visits, do not establish the level of history, systems review, or medical decision making to establish coverage for CPT code 99214, for each and every visit," and the MAC found that "[t]his level of documentation does not establish that the history or review of systems claimed were medically reasonable and necessary, for each and every visit." In addition, the MAC noted that the record documentation does not "necessarily establish that the documentation was not cloned in its essential respects," and it noted Dr. Galindo "did not document the time, which can be a material factor in documenting the level of service claimed." Lastly, the MAC noted that Dr. Galindo "has not cited to any authority for the proposition that it is due payment for a higher level of service than it claimed initially."

The MAC's review of the record and its reasoning in the final decision show that the MAC did not fail to apply the proper legal standards. Rather, the record before the undersigned reflects that the MAC was unpersuaded by Plaintiff's evidence and documentation and drew negative inferences from the nature and quality of the documentation and records.[12] Plaintiff fails to provide meaningful support for the proposition that the MAC was required to go through a more rigid inquiry about whether Plaintiff met two of three elements to establish coverage for CPT code 99214, nor

---

[12] Plaintiff does not dispute that he had the burden of demonstrating medical necessity and entitlement to payment.

does Plaintiff argue that the MAC's decision on this issue is not supported by substantial evidence.

In sum, the undersigned agrees with Defendant and finds that substantial evidence supports the MAC's resolution of this issue, as quoted above from the MAC decision. Moreover, there is no indication at all that the MAC failed to apply the proper legal standards. Mere disagreement with the MAC's resolution of the evidence does not transform this issue into a matter of legal error.

### Issue 4

### *Arguments*

Plaintiff argues that the final agency decision should be reversed because the Council erred as a matter of law by refusing to direct payment for many of the denied EPO injections because the coverage guidelines set forth in LCD L8850 are manifestly unclear. Plaintiff's argument is as follows:

> Section 1879 of the Act allows for Medicare payment of otherwise denied services in cases where the provider did not know, nor could he reasonably have been expected to know, that payment would not be made. 42 U.S.C. § 1395pp; *see also Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968 (10th Cir. 2016) (directing payment for denied services under section 1879). The liability limitation provisions of section 1879 apply in cases where services have been denied because they were allegedly not medically reasonable and necessary or because they constituted custodial care. 42 C.F.R. § 411.400(a). CMS regulations set forth four criteria to be used to determine when a provider had knowledge that services would not be covered by Medicare:
>
> > 1. The [Quality Improvement Organization], intermediary, or carrier has informed the provider, practitioner, or supplier that the services furnished were not covered, or that similar or reasonably comparable services were not covered.
> >
> > 2. The utilization review committee for the provider or the beneficiary's attending physician had informed the provider that the services were not covered.
> >
> > 3. Before the services were furnished, the provider, practitioner, or supplier

informed the beneficiary that the services were not covered or the beneficiary no longer needed covered services.

4. It is *clear* that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage *on the basis of the following*: [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guidelines or directives from intermediaries, carriers…; Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service; or [i]ts knowledge of what are considered acceptable standards of practice by the local medical community.

*Id.* at § 411.406(b)-(e) (emphasis added); *see also* MCPM (Pub. 100-04, Rev. 1186), Ch. 30 § 40.1 (2006).

In this case, the record does not contain evidence and there has been no suggestion that Dr. Galindo received notice from the Medicare carrier, QIO, or utilization review committee that the EPO injections would not be covered; nor did he inform the beneficiaries that the services would not be covered or that they did not require covered services. The principal issue is thus whether Plaintiff could have known or been expected to know that the EPO injections would be denied based upon his constructive knowledge of Medicare coverage guidelines, embodied here by LCD L8850. The appropriate inquiry according to the implementing regulation is whether the coverage parameters of the LCD were sufficiently "clear." *Id.* § 411.400(e).

The clinical parameters for establishing a qualifying diagnosis of anemia in CKD under L8850 are manifestly unclear. The ALJ acknowledged as much during the pre-hearing conference when she stated:

**JUDGE KAMPHUIS ZATOPA:** Okay. It seems to be a lot of, as far as decisions here [for the EPO claims], turned on whether the person had chronic kidney disease. *But I couldn't find, it seems, to be a precise definition for that for purposes of determining whether the medication was properly provided or administered.* And I would ask that both parties, I'm just going to call you parties, address what's the appropriate way to determine chronic kidney disease during the time frame that we're looking at.

AR 07696 (emphasis added). As part of its pre-hearing position paper, Health Integrity appeared to at least tacitly concede that LCD L8850 does not contain a clear definition of CKD; the ZPIC stated that its medical reviewers, "…applied the National Kidney Foundation KDOQI Clinical Practice Guidelines for Chronic Kidney Disease when reviewing the records in this case." AR 00605. If L8850 contained a clear definition of anemia in CKD, then the ZPIC's medical review

analysts would have presumably not relied on the KDOQI guidelines. Both of these facts strongly support Plaintiff's position that L8850 is fatally vague as to the issue of what clinical parameters should be used to establish a qualifying diagnosis of anemia in CKD.

In its decision, the Council acknowledged that the clinical markers identified in the LCD. As noted *supra*, n.7, TrailBlazer revised L8850 six times during the audit period for this case. *See* P. App. 029-143. None of those revisions affected the LCD's description or definition of CKD to be used as evidence of kidney damage are "non-exclusive." *See, e.g.*, AR 00056. But the Council did not identify any additional clinical markers that would have been sufficient to qualify as evidence of kidney damage, nor is it clear from the decision what information Dr. Galindo should have recorded to establish the qualifying diagnoses in a matter satisfactory to the Council. *See* AR 00053-00062. Nevertheless, the Council refused to award relief to Plaintiff under section 1879, concluding:

> Administrative authority establishes a *presumption* that a practitioner is liable for noncovered charges when the practitioner did not provide the beneficiary with prior written notice of non-coverage through an Advance Beneficiary Notice (ABN), unless the practitioner provides a 'convincing showing' that it lacked knowledge. The appellant has made no such showing in this case. Second, the appellant's argument that liability is only established when it is 'clear and obvious' that a provider would have known of non-coverage is also unavailing. The appellant's argument ignores the regulatory standard establishing constructive knowledge based upon receipt of CMS and contractor issuances. The original effective date for LCD L8550 [sic] is March 25, 2002, approximately four years before the services under review.
>
> While the appellant refers to the [National Kidney Foundation] KDOQI throughout its arguments, there is no evidence to indicate the appellant filed a challenge to the LCD, as provided by regulation, with an ALJ through the Departmental Appeals Board to include clinical parameters for a more detailed definition of anemia due to CKD. The Council cannot set aside an LCD for purposes of a claim appeal, and the appellant was long on notice of the LCD contents and requirements prior to the dates of service.

AR 00084 (emphasis original, citations omitted).

As an initial matter, the presumption created by MCPM Ch. 30 § 40.1.1 and referenced by the Council is simply a constructive knowledge standard. Dr. Galindo concedes that, as a Medicare provider, he is charged with constructive notice of pertinent laws, rules, and regulations. But the inquiry does not end with the attribution of constructive knowledge. The regulations and other manual provisions

also require review of whether the pertinent coverage guidelines are sufficiently "clear" in order to defeat an 1879 limitation. *See* 42 C.F.R. § 411.400(e); MCPM Ch. 30 §§ 40.1, 40.1.2. If the Council's interpretation of the relevant authority was correct, then no provider would ever qualify for payment under section 1879 because all providers are charged with constructive notice of the coverage rules. This would render the statute a veritable nullity. *Cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous.").

Dr. Galindo's argument does not ignore the constructive knowledge standard created by Medicare regulations, as the Council suggests, but rather embraces the totality of it. The regulation uses the word "clear," and the MCPM states that payment under section 1879 will only be defeated where it is "clear and obvious" that providers have rendered non-covered services. MCPM Ch. 30 §§ 40.1.2. The Council ignores this modifying language by refusing to inquire as to the clarity of the LCD provisions in light of the unique circumstances of this case. *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts should give effect to every clause and word when interpreting statutes). The Council's flawed legal interpretation of Medicare regulations and manual instructions thus constitutes an error of law.

The Council's observation that Dr. Galindo should have filed a challenge to the LCD in the appropriate forum is also misguided because that would have the effect of creating a new condition that a provider must meet to receive reimbursement for otherwise denied services under section 1879. There is no statute, regulation, or subregulatory requirement that a provider contest an LCD at the time it is issued in order to qualify for future payments under section 1879 if and when the LCD is implemented. As the Fifth Circuit observed in *Elgin*:

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

718 F.3d at 494 (quotation omitted).

Based upon the language of LCD L8850, the clinical parameters for establishing a qualifying diagnosis of anemia in CKD were certainly not "clear" or "clear and obvious." And given the "non-exclusive" nature of the list of clinical markers of kidney damage identified in the LCD, Plaintiff would have also had no way to know that the Council and the ALJ would only accept creatinine levels as sufficient evidence of kidney damage. The Council's decision that Dr. Galindo does not qualify for payment for all such denied EPO injections under section 1879 is thus erroneous

as a matter of law and unsupported by substantial evidence.

(D.E. No. 19 at 21–25.)

Defendant argues, among other things, that Plaintiff raises essentially the same arguments to the Court that it presented to the MAC; however, the MAC found that he did not meet the criteria for waiver under section 1879 of the Act, and the MAC's determination is supported by substantial evidence. (D.E. No. 23 at 32.) Defendant reiterates that federal courts should "not reweigh the evidence, try the issues de novo, or substitute [its] judgment for that of the Secretary." *Id.*

**Findings and Conclusions**

The undersigned concludes that the MAC's denial of a Section 1879 Waiver is supported by substantial evidence and was not the result of the MAC's failure to apply the proper legal standards. In reaching this conclusion, the undersigned includes a fuller excerpt from the MAC decision than Plaintiff has provided for the purposes of his arguments. In its decision, the Council refused to award relief to Dr. Galindo under section 1879, as follows:

> Administrative authority establishes a *presumption* that a practitioner is liable for non- covered charges when the practitioner did not provide the beneficiary with prior written notice of non-coverage through an Advance Beneficiary Notice (ABN), unless the practitioner provides a 'convincing showing' that it lacked knowledge. The appellant has made no such showing in this case.
>
> Second, the appellant's argument that liability is only established when it is 'clear and obvious' that a provider would have known of non-coverage is also unavailing. The appellant's argument ignores the regulatory standard establishing constructive knowledge based upon receipt of CMS and contractor issuances. The original effective date for LCD L8550 [sic] is March 25, 2002, approximately four years before the services under review. While the appellant refers to the [National Kidney Foundation] KDOQI throughout its arguments, there is no evidence to indicate the appellant filed a challenge to the LCD, as provided by regulation, with an ALJ through the Departmental Appeals Board to include clinical parameters for a more detailed definition of anemia due to CKD. The Council cannot set aside an LCD for purposes of a claim appeal, and the appellant was long on notice of the LCD contents

and requirements prior to the dates of service.

The appellant also concedes in its request for review that a substantial portion of its EPO claims did not meet the LCD coverage standard ([AR 123-124]), and the Council's review of the case record reveals no indication that the appellant considered NKF KDOQI practice guidelines involving GFR calculation or laboratory test markers when ordering the EPO injections. Instead, the Council's review indicates that the disease marker mentioned in the LCD, creatinine level, was generally normal for all services.

* * *

Applying the standard in 42 C.F.R. § 411.406, the Council agrees with the ALJ that the appellant is liable for non-covered services under section 1879 of the Act.

AR 84.

Plaintiff fails to explain or show that there was an error of law for the purposes of this issue. In support of his argument, Plaintiff cites to a regulation that does not exist: 42 C.F.R. § 411.400(e). Even if this is a typo, and Plaintiff meant to cite to § 411.406(e), the issue under this provision is whether Plaintiff "could have been expected to have known," which Plaintiff acknowledges is the standard at the beginning of his argument. By the end of his briefing on this issue, however, Plaintiff seems to be arguing that, under the constructive knowledge criteria, it had to be clear—or clear and obvious—to him that the EPO injections would be denied and that this inquiry focuses on whether the LCD was sufficiently clear. Plaintiff seems to be advancing a "test" that has all the trappings of "actual knowledge," not "constructive knowledge." For proof of the lack of clarity, Plaintiff points to discussions that occurred in the proceedings before his appeal to the MAC, such as statements by the ALJ and Health Integrity doubting the clarity of this LCD, but the undersigned does not find those references particularly persuasive as support for the conclusion that the MAC failed to follow the proper legal standards in its review of the waiver issue or in evaluating whether the LCD is not

"clear." Also, the MAC's decision is the "final" decision under review.

Another argument Plaintiff advances is that the Council imposed some sort of creatinine requirement on Dr. Galindo, when creatinine is a non-exclusive marker under the LCD, and the Council failed to tell Dr. Galindo what he needed to document in his charts to satisfy the Medicare requirements. By arguing that the Council imposed some sort of creatinine requirement on Dr. Galindo, when creatinine is a non-exclusive marker under the LCD, and the Council failed to tell Dr. Galindo what he needed to document in his charts to satisfy the Medicare requirements, Plaintiff is attempting to place a burden of proof on MAC that it does not have. It is Plaintiff's burden to overcome the constructive knowledge standard.

The undersigned finds that none of these arguments are sufficient to demonstrate that the MAC failed to apply the proper legal standards. Plaintiff's accusations of legal error rest on attenuated readings of the relevant authorities and attenuated reasoning. The Council's written decision reflects that it considered the same arguments Plaintiff advances here, but it simply disagreed with them. As Defendant correctly argues, given the express language of the LCD, Plaintiff can hardly claim he should not be expected to know that EPO injections for patient with normal creatinine levels, asymptomatic anemia, or a lack of chronic renal insufficiency were likely to be noncovered. *See Clinic Res. Mgmt. v. Burwell*, Civil Action No. H–14–578, 2015 WL 3932657, at *15 (S.D. Tex. June 26, 2015) ("Clinic Resources should have known, based on the language of local coverage determination L1937—not on an administrative interpretation of that local coverage determination—that claims based on incomplete, missing, ambiguous, or misleading documents were not covered"). The MAC noted that, "the Council's review indicates that the disease marker mentioned in the LCD, creatinine level, was generally normal for all services." In

other words, the express language of the LCD refers to creatinine. The decision noted that Dr. Galindo submitted 8633 claims for EPO shots during a 27 month period – an average of 16 per day – and he should be held accountable for documenting his compliance with the terms of LCD L8850.[13] The MAC explained that Plaintiff had been on notice for years about the LCD requirements. The MAC explained that the Council may not set aside or review the validity of a LCD for purposes of a claim appeal. *See* 42 C.F.R. § 405.1062.

Plaintiff raises essentially the same arguments to the Court that it presented to the MAC and the MAC found that the he did not meet the criteria for waiver under section 1879 of the Act. As Defendant correctly argues, Dr. Galindo acknowledges that he is charged with constructive knowledge of the pertinent laws, rules, and regulations, but he seeks to avoid liability by conveniently claiming that these authorities simply were not "clear." Once again, on judicial review, Plaintiff attempts to turn the consideration and disposition of the evidence by the MAC into a matter of legal error. Once again, however, Plaintiff fails to explain why the disposition of the evidence amounts to legal error. Unfavorable fact finding in this instance does not amount to legal error in the manner Plaintiff argues in this case. In the absence of more, the possibility that the MAC *could* have viewed and ruled on the evidence differently (*i.e.*, in a manner favorable by Dr. Galindo) does not turn run-of-the-mill fact finding into legal error, capriciousness, or an abuse of discretion.[14]

---

[13] Plaintiff complains that this evidence was improperly relied on by the MAC. However, the Court does not review the relevancy of this evidence to the MAC for the purposes of judicial review. *See Greenspan*, 38 F.3d at 236 (explaining that federal courts conducting judicial review of an administrative proceeding of this nature should "not reweigh the evidence, try the issues de novo, or substitute [its] judgment for that of the Secretary").

[14] Although Plaintiff argues that the MAC's statement that there was "no evidence" that Plaintiff ever attempted to challenge the LCD is inappropriate because there is no requirement that a provider so do, the undersigned finds that, even assuming Plaintiff's argument is correct,

Federal courts conducting judicial review of an administrative proceeding of this nature do "not reweigh the evidence, try the issues de novo, or substitute [its] judgment for that of the Secretary." *Greenspan*, 38 F.3d at 236.

The undersigned concludes that the MAC's determination is supported by substantial evidence, and the undersigned finds Plaintiff's contentions of legal error to be unsupported by the record.

## V.  CONCLUSION

### *Recommended Disposition*

After careful review of the record and relevant law, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion be **GRANTED** for the reasons explained in this Report.  Accordingly, the Secretary's final decision should be **AFFIRMED** and the case be closed.

### *Notice to the Parties*

Within 14 days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  The district judge to whom this case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

---

this statement by MAC does not undermine the other evidence that supports the MAC's decision on this fourth issue.  *But see* 42 C.F.R. § 405.1062(c) (explaining that the MAC may not set aside or review the validity of an [LCD] for purposes of a claim appeal).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from de novo review by the District Court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of plain error or manifest injustice.

The clerk of this Court shall forward a copy of this document to the parties by any receipted means.

**DONE** at McAllen, Texas, this 7th day of September, 2017.


_____
Dorina Ramos
UNITED STATES MAGISTRATE JUDGE